**INTERVEST FINANCIAL SERVICES, INC., Plaintiff,**

v.

**S.G. COWEN SECURITIES CORP., Defendant.**

Nos. 98–CV–3278, 99–CV–5463.

United States District Court, E.D. Pennsylvania.

June 19, 2002.

Michael K. Coran, Ira A. Rosenau, Klehr, Harrison Harvey Branzburg & Ellers, Philadelphia, PA, William H. Rooney, Tracy Zwick, Julie O. Veit, Wilkie Farr & Gallagher, New York City, for plaintiff.

John R. Taylor, Howard Langer, Sandals Langer & Taylor, LLP, Philadelphia, PA, Edward H. Mulvihill, White & Williams, Westmont, NJ, Ralph A. Jacobs, Ralph A. Jacobs, & Associates, LLC, Philadelphia, Michael T. Starczewski, Janssen & Keenan PC, Philadelphia, PA, Theodore R. Mann, Wolf Block Schoor & Solis-Cohen, Philadelphia, PA, Tanya B. Vanderbilt, Stuart M. Gerson, Robert J. Hudock, Epstein Becker & Green, Washington, DC, Susan M. Rabii, J. Brent Hooker, Michael A. Lampert, Saul, Ewing, Remick & Saul, Phildelphia, PA, for defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

The litigation underlying this case began on June 25, 1998 when Bloomberg, L.P. ("Bloomberg") filed suit against InterVest Financial Services, Inc. ("plaintiff" or "InterVest") to recover approximately $100,000 in unpaid advertising fees. In addition to filing a counterclaim against Bloomberg on September 3, 1998, InterVest filed a second lawsuit on November 3, 1999, against S.G. Cowen Securities, Inc. ("defendant" or "Cowen"), Bloomberg, and eleven other defendants including Merrill Lynch & Co., Inc. ("Merrill Lynch"), J.P. Morgan Securities, Inc. ("Morgan"), Bear Stearns Co., Inc. ("Bear Stearns"), Cantor Fitzgerald Securities and several other Cantor Fitzgerald entities ("Cantor"), Deutche Bank Securities Corp. ("Deutche Bank"), Liberty Brokerage, Inc. and several other Liberty entities ("Liberty"), and Salomon Smith Barney, Inc. ("Salomon").[1] In their complaint, InterVest alleges that the defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, participated in a conspiracy in restraint of trade in violation of Pennsylvania law, and tortiously interfered with the contractual relationship between Bloomberg and InterVest. Only Cowen remains as a defendant in this

---

1. The phrase "Broker-Dealers" describes the business of all defendants except Bloomberg and I will use it to refer to these companies as a collective entity.

case and it filed a motion for summary judgment on November 7, 2001. Plaintiff filed its opposition to that motion on December 21, 2001. On April 17, 2002, I held oral argument. After considering the arguments made by the parties and the relevant law, I will grant Cowen's motion for summary judgment.

## I. Factual Background[2]

### A. The Bond Market

In this case, much of the relevant information centers on the structure of the existing market for corporate and municipal bonds. Unlike common stock, no open market exists for trading these bonds. Institutional investors who wish to purchase bonds must obtain them from a relatively exclusive group of dealers, including the broker-dealer defendants. These dealers obtain their supply of bonds by executing trades with other dealers, sometimes negotiated through "inter-dealer" brokers. While some inter-dealer brokers will sell to other dealers on a fixed commission basis, the dealers do not make similar arrangements available to institutional investors. Instead, each investor must negotiate the price of purchase on an individualized basis, enabling the broker-dealers to earn a profit through the "spread"—the difference between the price they paid for the bond and the price at which they resell it to the investor. Because no open system of trading exists, the institutional investor has little knowledge of what the spread is on a particular transaction. This lack of public reporting or marketing of the bonds, gives the trading a lack of "transparency."[3]

### B. The InterVest System

InterVest sought to change that opaque system when it entered the bond market in 1993, by providing an electronic trading system where buyers and sellers could anonymously trade corporate and municipal bonds. In addition to matching buyers and sellers, InterVest offered an end to undisclosed spreads by charging a fixed commission fee known to both parties. Operating as a modem based system, InterVest conducted 400 trades and by the end of 1993 had thirty subscribers. Larry Fondren ("Fondren"), the founder and chief executive of InterVest, still had loftier goals for his company. In 1993, InterVest approached a number of bond dealers with the concept of an "InterDealer" consortium—which would allow these dealers to use the InterVest system as their own trading platform. Though several dealers met with or spoke to Fondren about the project, eventually the dealers universally rebuffed the project. A vice president at Merrill told Fondren that he hoped the company "crashes and burns," noting that the shift to a transparent system would put an end to large spreads and large profits for the traditional dealers. (ACT Note, March 17, 1993.)[4] The following

2. As is appropriate on defendant's motion for summary judgment, I have considered all facts in the light most favorable to InterVest.

3. Until 1991, government bonds were also traded in a closed system. However a system called GovPX now operates as a real-time reporting service for quotes and transactions in Treasury securities.

4. Plaintiff has taken many of its facts from the ACT Notes kept by Fondren and other Inter-

Vest employees. As used by InterVest, beginning in 1992, the database provided a means of recording significant events and conversations relevant to the company's business. After a meeting, Fondren would use a tape recorder to report on the meeting and then his administrative assistant would transcribe the tape into the ACT Notes system.

Cowen argues that many, if not all, of the ACT Notes entries constitute inadmissible hearsay. In reply, InterVest offers numerous justifications and exceptions to the hearsay

month, Fondren met with Ben Kuenemann of Bear Stearns who indicated that his company had no interest in dealing with InterVest and that he would "be discussing the intentions of IFS [InterVest] with other dealers." (ACT Note, April 6, 1993.) In May 1993, Fondren met with Joe Macchia of Liberty who echoed the sentiments of Merrill and Bear Stearns. Fondren also had a meeting with representatives of Cowen in June 1993. At that time Cowen also expressed concern about the InterVest system, in particular about the "equal and anonymous access" it gave to institutional investors. (ACT Note, June 11, 1993.)

### C. InterVest and Bloomberg

Despite these early setbacks, InterVest made a significant breakthrough in 1995 when it entered into an arrangement with Bloomberg, whereby Bloomberg would carry the InterVest system on its electronic network. The Bloomberg electronic network was a vital source of information on financial markets and transactions and during the 1990s had between sixty and seventy thousand terminals placed with financial companies on both the buy and sell sides of the financial world. Though Bloomberg was considered the market leader as a provider of financial information, prior to the introduction of InterVest on the network, the system, consistent with the opaque market, did not carry any actual price information for corporate bonds. Excited about this new relationship, InterVest directed the majority of its resources to making it successful, and its investors viewed the relationship as one essential to InterVest's future success. (Dep. of Guy Naggar at 40.)

From its outset, the relationship between Bloomberg and InterVest gave rise to disagreements about the nature of their mutual obligations.[5] Though the companies had entered into a lease agreement on July 15, 1995 and a rider agreement on August 31, 1995, on December 27, 1995, Charles Garcia ("Garcia"), the manager of the InterVest account for Bloomberg, contacted Fondren and indicated that troubles had arisen. According to Fondren, Garcia reported that after seeing the advertisements for the InterVest system, some other customers had complained to Bloomberg. In response to those complaints, Bloomberg had placed a moratorium on the development of the InterVest system on their network but would reimburse InterVest for its advertising expenses.[6] (Dep. of Fondren at 287–294.) Bloomberg itself had previously expressed concern over the content of the ads and on October 18, 1995 one dealer, not named as a defendant in this suit, sent an e-mail to Bloomberg stating their discomfort with the In-

rule providing for their admissibility. Additionally, the deposition testimony of Fondren repeats much of what the ACT Notes contain. After careful consideration of the issues involved, I have determined that I need not rule on the admissibility of the ACT Notes to dispose of the summary judgment motion. Therefore, for purposes of defendant's motion for summary judgment, I have considered the entries in the ACT Notes as evidence of the alleged conspiracy.

5. Bloomberg contends that its relationship with InterVest was somewhat of an accident. Plaintiff approached Bloomberg as early as 1993 about commencing a relationship between the companies and at that time Bloomberg indicated it had no interest. In 1995, a Bloomberg salesman with no knowledge of the previous interaction approached InterVest about becoming a Bloomberg subscriber. (First Amended Counterclaim at ¶ 19; Dep. of Charles Garcia at 55.)

6. Because the InterVest trading system had been independently designed, both Bloomberg and InterVest needed to invest a significant amount of work into making their two systems compatible.

terVest concept. The sender, an employee of ABN Amro Securities, also questioned Bloomberg's support of something that directly competes with its current subscribers and concluded, "I am sure that I am not the only one that feels that way." (E-mail from Bob Mann of ABN Amro Securities to Stephanie Seward, October 18, 1995 at 8:57 A.M.)

InterVest challenged the moratorium and threatened to take legal action against Bloomberg. On January 30, 1996, after an exchange of correspondence between counsel, Bloomberg agreed to reinstitute the InterVest project. Bloomberg followed this verbal assurance with a letter on February 14, 1996, agreeing to support the InterVest product for one year from the announcement of the release. (Letter of February 14, 1996 from Garcia to Fondren.) In a second letter, on June 25, 1996, Bloomberg provided InterVest with further assurances of a commitment to establishing a corporate and municipal bond trading system. (Letter of June 25, 1996 from Mason Power to Fondren.) Despite these direct assurances, InterVest points to a series of internal e-mails at Bloomberg that demonstrate Bloomberg's hesitation about taking the InterVest system live. Nonetheless, on December 9, 1996, Bloomberg held a press conference at its New York headquarters and announced that the InterVest system would go live for the trading of government and corporate bonds by the end of that year and municipal bonds would follow shortly thereafter. (Dep. of Fondren at 318–320.) A significant amount of publicity accompanied this announcement. The *New York Times* ran an article in its financial section noting that the InterVest system would

attempt to change the traditional bond trading system. *See* Floyd Norris, *A Bond Trader Will Put Quotes and Trades Online*, N.Y. Times, December 9, 1996, at D4. Bloomberg also posted one of · its reporter's interview with Fondren on the "Bloomberg Forum." (Dep. of Fondren at 318–320.)

The following morning, on December 10, 1996, Fondren received a phone call from Garcia indicating that Bloomberg was placing another moratorium on the development of a municipal trading platform. When pressed for a reason, Fondren claims that Garcia told him that inter-dealer brokers had placed "tremendous heat" on Bloomberg and specifically cited pressure from defendant Cowen. Though less confident of this aspect of the conversation, Fondren also believes that Garcia began to mention another firm, Tull in Tokyo, but stopped himself.[7] (Dep. of Fondren at 324–25.)

### D. *InterVest and Cowen*

Just one week prior to the announcement of the InterVest launch, Fondren had met with Bill Matthews ("Matthews") and Joseph Cohen, Cowen's chairman, about the possibility of Cowen trading with InterVest. Notes from, or in preparation for the meeting, which appear to be commenting on a written proposal, indicate that "Dealers want present structure not price disclosure," and asked "What about Cowen brokers and spreads." (Notes dated December 2 (author unknown, produced by Cowen during discovery.)) At that meeting, Cowen again refused to partner with InterVest, and indicated that showing clients prices was "not in our best interest." Further, they tried to dissuade Fon-

---

7. Garcia acknowledges both this conversation with Fondren and his conversation with Bill Matthews of Cowen, but claims that Matthews did not complain about InterVest, and simply mentioned in passing that he had seen the publicity on the InterVest product. (Dep. of Garcia at 161–62.)

dren from altering the market and advised him he would make more money if he did not try to "break the spreads," and instead played by the rules. (Dep. of Fondren at 836–839; ACT Note, December 2, 1996.) This meeting echoed the sentiments expressed at a meeting between Cowen and InterVest that took place in April 1996. While it would not trade or partner with InterVest as currently organized, Cowen did indicate that if InterVest changed the system to make it available to broker-dealers only, they would certainly participate and perhaps invest in the company. (ACT Note, April 10, 1996.) [8]

While both of these meetings were cordial, several exchanges allegedly took place in between April and December, which were less polite. On May 20, 1996, a Cowen employee named Larry Scheer replied to an InterVest e-mail ad by stating "Fuck you.... Enough people squeezing us ... we don't need another." (E-mail of May 20, 1996 from Larry Scheer to Fondren.) On October 23, 1996, an "irate" salesman at Cowen's corporate bond desk phoned InterVest and refused to give his name, but expressed outrage that InterVest was going to "let the Buy-side in" and InterVest was "taking food from the mouths of his kids." (ACT Note of March 21, 1997 (documenting phone call of October 23, 1996).) Despite these hostile responses from Cowen employees and three previously unfruitful meetings, Cowen and InterVest met again in May 1997. Tom Evans of Cowen initiated the contact, and wished to discuss the possibility of using InterVest to develop Cowen's own internet product. The meeting, however, was unproductive as Matthews also attended and expressed his continuing dissatisfaction with InterVest's buy side business model.

Matthews allegedly stated that InterVest was a direct competitor of Cowen and that "doing business with InterVest was viewed by the street as 'unhealthy.'" When Fondren intimated that keeping InterVest out of the market might give rise to a lawsuit, Matthews allegedly laughed and stated, "'it will take you a long time to collect' and even if we paid you $10M or $20M, it would be just a cost of doing business," indicating it was worth the price to "kill something like InterVest." (ACT Note of May 29, 1997.)

### E. Termination of the Bloomberg Agreement

Just as InterVest's relationship with defendant Cowen deteriorated steadily, from the time of Bloomberg's InterVest announcement forward, the relationship between the companies entered into a downward spiral. Bloomberg took the unusual step of pulling the Fondren interview from its network and excluded InterVest from its listing of available trading networks. (Dep. of Jacoby at 213.) Eventually, on February 5, 1998, Bloomberg terminated its agreement with InterVest. (Letter of February 5, 1998, from Louis Eccleston to Fondren.) The reasons for the termination of the agreement are the subject of significant dispute between the parties. For the duration of its involvement in this lawsuit, Bloomberg asserted that it terminated its relationship with InterVest because of a lack of interest in its product among Bloomberg users. Bloomberg invested significant time and financial resources in preparing the system to go live, but during the time InterVest was available on Bloomberg, users completed only ten trades on the system and all of these had been prearranged by telephone.

---

**8.** Apparently, Joseph Cohen and Larry Fondren had a mutual friend who remained continually optimistic about the chances of co-operation between their two companies and encouraged these repeated meetings. (Dep. of Fondren at 836.)

(Dep. of Fondren at 117, 119, 136.) Inter-Vest's 1997 losses exceeded $2.5 million, no active subscriber signed onto the system, and the company had laid off all employees, leaving only a skeleton staff.[9] ( Rapp Report at Exhibit 8; Fondren Dep. at 1714, 1729–30; McGuinn Dep. at 253–55.) Because InterVest never obtained the li-quidity needed to become a successful marketplace for the buying and selling of bonds, it made no sense for Bloomberg to continue its relationship with the failing company.[10]

While InterVest does not dispute its lack of success on the Bloomberg system, it takes a different view of the termination and attributes that failure not to a genuine lack of interest in its product, but to the illicit actions of Cowen and other former defendants in this case.[11] In short, Inter-Vest contends that as a participant in a conspiracy to maintain an opaque market and high spreads in the bond trading market, Bloomberg failed to provide the prom-ised and necessary support to make the InterVest system a successful one. More importantly for purposes of this motion, InterVest maintains that the broker-deal-ers in the bond market, defendant Cowen among them, also joined in this conspiracy and not only refused to deal with Inter-Vest, but pressured Bloomberg to do the same. The influence of this illicit conspir-acy effectively doomed InterVest to failure by denying it both liquidity and a vital trading platform.

### F. BondNet

In support of its claim, InterVest points to the relationship between Bloomberg and another real-time bond trading system, BondNet, and its parallels with its own relationship with Bloomberg. Bloomberg and BondNet entered into a lease agree-ment in 1996. Though it functioned simi-larly to InterVest, the companies differed in one significant respect—BondNet oper-ated solely as an inter-dealer broker, and therefore did not make information about pricing generally available to the investing public. As a sell side firm, BondNet con-formed to the existing structure of the bond market. However, after being ac-quired by the Bank of New York in 1997, BondNet began considering serving buy side customers as well, moving their busi-ness model closer to InterVest's. At this point, Bloomberg became less comfortable with its connection to BondNet. In an e-mail exchange dated August 18, 1997, two Bloomberg employees discussed the situa-tion. Referring to the manager meeting notes part on "Mike saying no to firms like InterVest," the writer indicated that Bond-Net was considering moving to the buy side and questioned whether Bloomberg

9. As InterVest employees started looking for other work, some employees of other firms responded less than warmly. One worker at Credit Suisse First Boston responded to an employment inquiry by stating, "Tried to fuck the street. What'd you think would hap-pen????!!"

10. If InterVest was to succeed, it needed to obtain a sufficient supply of bonds to attract would-be purchasers. As only the broker-dealers and inter-broker dealers maintained a large supply of bonds, InterVest needed some of these dealers to agree to place their bonds for sale on its transparent trading system. Despite InterVest's attempts to convince the dealers to participate, no one agreed to place its "supply" on the InterVest system.

11. Defendant points out that in December 1997, InterVest had another explanation for its financial woes. In a letter written to Marc Michel, Managing Director of EOS Partners, counsel for InterVest accused EOS of failing to honor its investment obligations and con-vincing other investors to follow suit thereby preventing InterVest from "develop[ing] and market[ing] a promising business." (Letter of December 29, 1997, from Robert Hayes to Marc Michel.)

wanted to renew the contract.[12] In reply, Lou Eccleston of Bloomberg ("Eccleston") indicated he saw no reason to renew, but asked if the platform had much activity. (E-mail of August 18, 1997, from Ken Wagner to Eccleston.)

At the same time Bloomberg began considering the future of its relationship with BondNet, its relationship with InterVest remained precarious. In September 1997, Eccleston barred Bloomberg employees from speaking to a reporter about InterVest. (E-mail of September 17, 1997, from Patti Harris to Christine Taylor.) BondNet confirmed Bloomberg's suspicions of its plan to shift to include buy side customers in November. At a meeting between Bloomberg and BondNet, Bloomberg indicated that while it was considering other options, its inclination was not to permit BondNet to function in this buy side capacity at all. (E-mail of November 21, 1997, from Kevin Foley of Bloomberg to Eccleston). BondNet apparently accepted this restriction, but expressed dissatisfaction that InterVest continued to publicize its own buy side system as available over the Bloomberg network. On December 11, 1997, Kevin Foley, a Bloomberg employee, contacted Eccleston, his superior, and asked "when does our contract with InterVest let us throw them off the system ... it would be nice to just close ITV [InterVest] down." In response Eccleston indicated that Bloomberg should treat BondNet and InterVest consistently. Foley, however, expressed concern about limiting InterVest to sell side accessibility on the Bloomberg system because unlike BondNet (and its owners, Bank of New York), it had invested significant resources in developing its buy side system, InterVest had "nothing left to lose," and Bloomberg could not really trust it to honor any agreement it made. (E-mail of December 11, 1997, from Kevin Foley to Eccleston.) Bloomberg alleges that therefore, left with what it perceived as little choice, it terminated its agreement with InterVest effective February 6, 1998. (E-mail of February 9, 1998, from Eccleston to Fondren.) Just weeks before this termination, Thomas Price of Bank of New York wrote a memo concerning BondNet. In his memo, he expressed concerns similar to those of InterVest, namely dissatisfaction with Bloomberg and the restrictions it placed upon the platform's functionality. He also noted that in mid-December, Bloomberg had barred them from adding buy side customers "because of pressure from Wall Street." (Memorandum of Thomas Price, January 22, 1998.)

## II. Legal Standard

Although there are differences which will be explained later, generally, in an antitrust case, the court applies the traditional summary judgment standard. See *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir.1998). Pursuant to Federal Rule of Civil Procedure 56, a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The trial court must determine whether there are issues with regard

---

12. Plaintiff goes to great lengths in attempt to directly link this statement to Michael Bloomberg and have not successfully done so, at least in part because Bloomberg could not produce the notes of the meeting where "Mike" made this statement. Granting plaintiff all reasonable inferences, I have assumed that the statement was made by Michael Bloomberg, though it does not seem particularly relevant precisely who made the statement.

to material facts that warrant a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making its ruling, the district court must consider the facts of the case in the light most favorable to the nonmoving party and give that party the benefit of any reasonable inference that a finder of fact might draw. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Sempier v. Johnson and Higgins*, 45 F.3d 724, 727 (3d Cir.1995) (en banc). Summary judgment is appropriate where the court finds that the record "could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.'" *Matsushita* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## III.  *The Sherman Act Claim* [13]

### A. *Per se versus rule of reason analysis*

In Section 1 of the Sherman Act, Congress declared that "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce ... is hereby declared illegal." 15 U.S.C. § 1 (2000).[14] Two alternate methods are used to consider a violation of the Sherman Act. One uses the rule of reason analysis, the other deems it per se illegal. *See Eichorn v. AT & T Corp.*, 248 F.3d 131, 142 (3d Cir.2001). Where a number of horizontal competitors join together and collectively boycott the plaintiff, courts have generally applied the per se rule. *See Rossi*, 156 F.3d at 462. In order to establish a per se § 1 violation, a plaintiff must show only that: (1) the defendants contracted or conspired together; and (2) that the conspiracy was a proximate cause of injury to the plaintiff. Courts apply rule of reason analysis in cases where the alleged conduct of the defendants has some procompetitive or other redeeming value. In those situations, the plaintiff bears the additional burden of demonstrating that the illegal conspiracy created anti-competitive effects in the relevant market and that the aims of that conspiracy were illicit. *See Rossi*, 156 F.3d at 464–65.

In this case, the parties have not explicitly addressed whether the court should analyze InterVest's § 1 claim under the per se rule or rule of reason analysis.[15] It is however, immaterial to the outcome of this motion. Applying either standard, plaintiff must demonstrate that defendant engaged in some form of concerted action and that action proximately caused injury to plaintiff. To prevail on its claim then, InterVest must, at very least, prove that Cowen both conspired to maintain the closed system of bond trading and the high spreads it created and that it suffered injury as a result of that conspiracy.

---

**13.** In addition to bringing its claim under the Sherman Act, InterVest has alleged a violation of Pennsylvania's antitrust law. Pennsylvania has no separate antitrust statute and therefore the "allegation rises or falls with plaintiff's federal antitrust claims." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir.1994) (*citing Collins v. Main Line Bd. of Realtors*, 452 Pa. 342, 304 A.2d 493 (1973)).

**14.** Though the statutory language seems to apply to all restraints on trade, court decisions have interpreted this provision to mean that only unreasonable restraints of trade are illegal. *See, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988).

**15.** Without explicitly saying so, the defendant appears to acknowledge that the allegations warrant per se treatment. In its motion for summary judgment, Cowen challenges only the necessary elements of a per se violation of § 1—plaintiff's ability to demonstrate concerted action and antitrust injury.

### B. Concerted Action

■ Some type of concerted action or an agreement among the parties is " 'the very essence of a section 1 claim,' " whether per se or rule of reason analysis applies. *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639 (3d Cir.1996) (*quoting Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir.1994)). No matter how distasteful or unfair, a unilateral action undertaken by a solitary defendant does not give rise to a § 1 claim. *Rossi*, 156 F.3d at 465. The Supreme Court has consistently adhered to the view that a private businessperson or entity may refuse to deal with another company. *See United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919). A plaintiff can demonstrate that the actions of parties were concerted rather than independent either through direct or circumstantial evidence. *See Rossi*, 156 F.3d at 465.

### 1. Direct versus Circumstantial Evidence

■ Either through direct or circumstantial evidence, a plaintiff carries the burden of demonstrating that the defendant conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764, 104 S.Ct. 1464. Not surprisingly, where the defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita*, 475 U.S. at 596, 106 S.Ct. 1348. But "even with a plausible motive to conspire, ambiguous conduct will not create a triable issue of fact with respect to the existence of a conspiracy." *Rossi*, 156 F.3d at 466. At the same time, the court must consider all evidence presented as a whole and cannot take a "com-partmentalized" view of the individual conspirators and events. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1364 (3d Cir.1992). "[I]n this regard . . . this court has been relatively hospitable to the efforts of plaintiffs to prove concerted action." *Rossi*, 156 F.3d at 467.

■ Though a plaintiff may rely solely on indirect, as opposed to direct, evidence, if it does so, it bears an additional burden in order to survive summary judgment. Where a plaintiff relies exclusively on circumstantial evidence in order to demonstrate concerted action by the defendants in antitrust cases, a modified summary judgment standard applies. *See Rossi*, 156 F.3d at 465. "Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348. A plaintiff must "present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (*quoting Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). The Supreme Court has noted that allowing the " 'inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of independent business judgment and emasculate the terms of the statute." *Monsanto*, 465 U.S. at 764, 104 S.Ct. 1464 (*quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 n. 2 (3d Cir.1980)).

■ "Direct evidence in a *Section 1* conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir.1999). It is the proverbial "smoking gun." *Rossi*, 156 F.3d at 465. Examples of direct evidence in antitrust

cases include: (1) a direct threat to the plaintiff from a competitor that if he went into business his competitors would do anything they could to stop him, including cutting prices or stopping supplies, *see id.* at 468; (2) advising distributors that a supplier would cut off access if the distributor failed to maintain a certain price level, *see Monsanto,* 465 U.S. at 765, 104 S.Ct. 1464; (3) a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators, *see Arnold Pontiac–GMC, Inc. v. Budd Baer, Inc.,* 826 F.2d 1335, 1338 (3d Cir.1987); and (4) a public resolution by a professional association recommending that its members withdraw their affiliation with an insurer, *see Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.,* 815 F.2d 270, 273 (3d Cir.1987). As the above examples illustrate, direct evidence generally initiates with the party against whom the plaintiff offers it. Where a plaintiff offers direct evidence the court does not have to consider the economic rationality of a defendant's conduct or the plausibility of the plaintiff's claim. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.,* 998 F.2d 1224, 1233 (3d Cir.1993).

### 2. *Plaintiff Has Not Presented Direct Evidence of Concerted Action*

■ Here InterVest contends that it has offered direct evidence of Cowen's participation in a conspiracy with Bloomberg and other broker-dealers to preserve the existing structure of the bond market. At oral argument, when I asked plaintiff's counsel to specifically identify the direct evidence, he pointed to the Bank of New York memorandum. Tr. of Oral Argument, 49–50. In that document, Thomas Price, a Bank New York employee, states that Bloomberg informed them of its intention to stop adding buy-side customers because of "pressure from Wall Street." Memorandum of Thomas Price, January 22, 1998. However, I find plaintiff's assertion unpersuasive. Unlike a "smoking gun," the Bank New York memorandum requires a finder of fact to draw too many inferences for this court to consider it direct evidence. First, it requires the assumption that the memorandum actually reports what a Bloomberg employee told him, rather than Price's own interpretation of Bloomberg's actions. Once the factfinder assumes Bloomberg itself proffered such a reason, he or she must then also infer that Price accurately recalled the precise language used. Next, one must infer that the "pressure from Wall Street" actually constituted concerted action among the broker-dealers and Bloomberg, rather than a permissible response to customer complaints under *Monsanto.* Finally, because this memorandum fails to mention the specific Wall Street firms involved, the factfinder must infer that Cowen, an admittedly small customer of Bloomberg's, was a part of the "Wall Street" illegally acting in concert with Bloomberg. The link between that memo and any illicit actions of Cowen is simply too attenuated to provide compelling and direct evidence of an antitrust violation by defendant. Therefore, I find that the Bank of New York memorandum does not constitute direct evidence of a conspiracy involving Cowen.[16]

■ At oral argument InterVest also argued that the phone call to Fondren from Garcia, on December 10, 1996, in which Garcia allegedly reported that Bloomberg was under "tremendous heat" from the broker-dealers and specifically

---

**16.** This does not mean, however, that memorandum lacks any probative value and accordingly, the court will consider it as circumstantial evidence of the alleged conspiracy.

mentioned a complaint from Cowen, constitutes direct evidence of a conspiracy or concerted action to maintain high spreads. Dep. of Fondren at 324–25. Though this evidence is significant because it connects two of the alleged conspirators together, at best, it only serves as circumstantial evidence of concerted action between those parties. Considering this evidence in the light most favorable to plaintiff, all that InterVest has proffered is direct evidence of a complaint. The court cannot infer an agreement between Cowen and Bloomberg based upon this complaint, even if the adverse action InterVest suffered in its relationship with Bloomberg came about "in response to" the phone call from Cowen. *Monsanto,* 465 U.S. at 763, 104 S.Ct. 1464. The law requires InterVest to provide additional evidence to show concerted action, thereby barring any explicit link based solely on a competitor complaint. Because InterVest must do more to connect the phone call to concerted action, any direct connection between the Bloomberg phone call and a conspiracy involving Cowen is negated. Therefore, though I do not discount the importance of this piece of evidence, I cannot consider it direct evidence of a conspiracy.

█ Because InterVest has failed to offer direct evidence but has offered circumstantial evidence in support of its claim, I must impose upon plaintiff the additional burden of presenting evidence that tends to exclude the possibility that Cowen, Bloomberg, and the other broker-dealers acted independently. InterVest could also sustain this burden by raising a reasonable inference that Cowen and its co-conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Sweeney,* 637 F.2d at 111.

### 3. *Plaintiff's Indirect Evidence of Concerted Action*

In its various submissions, InterVest demonstrated that it had taken advantage of the broad ranging discovery permitted by this court, and provided numerous exhibits including correspondence, ACT Notes, and e-mails. Because it appeared to me that much of the evidence either did not relate or related only tangentially to the subject of this summary judgment motion, Cowen's liability for an antitrust violation, at oral argument I asked plaintiff to specifically identify what evidence it relied on in support of this claim. (Tr. of Oral Argument, 4–5.) Plaintiff cited to the following evidence:

(1) the closed nature of the bond trading system as compared with the transparent systems used for trading in other financial markets such as stocks;

(2) The former chairman of Cowen, Joseph Cohen's statement that he did not know why the system operated as it did and that if he made prices available publicly that no one would deal with him. (Dep. of Joseph Cohen at 21–24);

(3) The admissions of a number of other bond dealers, such as Morgan and Salomon, that they would not deal with InterVest because InterVest planned to show purchasers prices and would break the dealers spreads;

(4) The repeated proffers of friendly advice from the broker-dealers to InterVest that it would do a lot better if it "played by the rules";

(5) In a December 2, 1996 meeting with InterVest, representatives of Cowen indicated they were "adamantly opposed" to dealing with InterVest because showing clients prices was not in their best interest and that InterVest could make more money by not trying to break the spreads. (ACT Note of December 2, 1996);

(6) Just over a week after this meeting, Garcia of Bloomberg called Fondren and indicated that Bloomberg would not go forward with the municipal bond element and it had received a phone call from Cowen in response to an article that appeared in the *New York Times* the previous day. (Dep. of Fondren at 324–25);

(7) Following that phone call, Bloomberg took the "extraordinary action" of removing an interview with Fondren from its network. (Dep. of Garcia at 165);

(8) A series of internal e-mails exchanged by Bloomberg employees expressing concern about the buy side firms, specifically InterVest and BondNet. (E-mail of August 18, 1997, from Ken Wagner to Eccleston; E-mail of November 21, 1997, from Kevin Foley to Eccleston); and

(9) The internal Bank of New York memo in which states that Bloomberg placed limits on the buy side function of BondNet because of "pressure from Wall Street." (Memorandum of Thomas Price, January 22, 1998.)

To make its case against Cowen, InterVest must do more than show that some of the broker-dealers engaged in concerted action, it must also demonstrate that Cowen participated. A significant part of the above evidence involves the activities of other actors and fails to implicate Cowen. The statements of other broker dealers, numbers 3 and 4 above, Bloomberg's removal of the Fondren interview from the network, number 7 above, and Bloomberg's internal discussions of the buy side issue, number 8 above, in no way demonstrate defendant Cowen's collusion. As discussed earlier, the Bank New York memorandum, number 9 above, does not specifically identify "Wall Street," and requires a fact finder to infer Cowen's participation. Cowen's refusal to deal with InterVest, number 5 above, and its advice to them not to break the spreads, represents independent action and unilateral statements of Cowen.[17] InterVest has not proffered any evidence of meetings that took place between defendant and other broker dealers, much less any discussion at those meetings concerning a desire to adhere to the current system. So long as it acted alone, Cowen had the unfettered right to refuse to deal with InterVest. *See Alvord–Polk*, 37 F.3d at 998.

Only the complaint from Cowen to Bloomberg, number 6 above, shows Cowen's contact with another alleged co-conspirator. However, any complaint that Cowen made to Bloomberg, and any action taken by Bloomberg in response to that complaint, does not automatically demonstrate concerted action. In addition to showing this contact occurred, plaintiff must present evidence that tends to exclude the possibility that Bloomberg took action independently. *See Monsanto*, 465 U.S. at 764, 104 S.Ct. 1464. InterVest has not presented evidence sufficient to preclude independent action. At oral argument, plaintiff articulated the view that Bloomberg's fear of retaliation supports the contention that Bloomberg entered into some type of agreement with Cowen to knock InterVest off of its system.[18] But

---

17. The evidence that Joseph Cowen did not know why the system operated as it did and that he did not make prices public for fear of being shut out of the market, number 2 above, seems only to support the existence of a closed trading system, and that the market did not look favorably upon opening up the market, facts not in dispute in this case.

18. Throughout its earlier submissions to the court, plaintiff argued that Bloomberg was a one of a kind resource of financial information and was vital to its success. At oral argument, I asked plaintiff why it would matter to Bloomberg if Cowen used their system. Plaintiff responded that collectively the broker-dealers could have retaliated and used a different system. Though I did not pursue the

this same argument supports the opposite contention equally well—that Bloomberg made an independent decision to limit its relationship with InterVest in response to complaints of other customers.[19] A business decision choosing to satisfy one client over another does not constitute concerted action. *See Sweeney,* 637 F.2d at 111 n. 2.

In support of its contention that Bloomberg acted independently in pursuing the course of conduct ending with the termination of the InterVest contract, Cowen points out two flaws in plaintiff's assertions. First, Cowen argues that the delay between its alleged complaint to Bloomberg in December 1996, as reported in Garcia's phone call to Fondren, and Bloomberg's termination of the InterVest contract in February 1998, severely undercuts any inference of concerted action. Because more than thirteen months passed between Cowen's actions and Bloomberg's termination, the link between the two actions has become too attenuated to raise an inference of agreement between the two companies. InterVest, however, views the consequences as more immediate and cites the souring of the relationship between Bloomberg and Inter-Vest, and specifically the freeze placed on the development of the municipal trading platform which occurred almost immediately after the Cowen phone call. Plain-

tiff's response has intuitive appeal, but ultimately is unpersuasive because Cowen dealt solely in the trading of corporate bonds. Because Cowen does not deal in municipal bonds, it makes little sense to infer that Bloomberg and Cowen agreed to halt InterVest's expansion into the municipal market and becomes easier to conclude that Bloomberg developed an independent response to Cowen's complaints and in anticipation of other unhappy customers.

■ Nonetheless, when looking at the full landscape of evidence as the law requires, *see Big Apple BMW,* 974 F.2d at 1364, I conclude that a rational finder of fact might draw the series of inferences necessary to find that Cowen participated in a conspiracy with Bloomberg and other broker dealers in order to maintain the existing closed bond trading system. The establishment and perpetuation of a closed system, the allusions by various broker-dealers, including defendant Cowen, to the "rules," the universal refusal to deal with InterVest, the complaints to Bloomberg, and Bloomberg's subsequent resistance to buy side and transparent bond trading, all support an inference of conspiracy. However, plaintiff fails to survive summary judgment because all of this evidence supports equally well the inference that Cowen, other broker-dealers, and Bloomberg

---

issue further, it seems that if such alternatives existed, plaintiff could have also used them, thereby undercutting its argument that being on Bloomberg was essential to their survival.

**19.** The parties do not disagree with the characterization of Cowen as a relatively minor Bloomberg customer. While Cowen made much of its limited power to pressure Bloomberg, InterVest argued that where direct evidence of an agreement exists, that constraint has little relevance. However, plaintiff also acknowledged that where there is only indirect evidence, Cowen's lesser influence over Bloomberg would take on a more important role in deciding this motion.

Plaintiff has presented no evidence of contact between Bloomberg and other broker dealers (with the exception of a vague allusion to Tull in Tokyo, who was not named as a defendant in this case). However, Cowen's complaint may have provided the impetus for Bloomberg's evaluation of its relationship with InterVest. Though Bloomberg may have then feared retaliation from larger customers, this fear does not support the existence of an agreement between defendant and other broker-dealers or between defendant and Bloomberg.

acted independently and rationally in light of their own interests and consumer demand. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348. Even if the defendant had a rational motive to conspire, "ambiguous conduct will not create a triable issue of fact with respect to the existence of a conspiracy." *Rossi*, 156 F.3d at 466.

Here, while Cowen admittedly had a motive to conspire—to maintain high spreads and preserve profits—its conduct is equally consistent with other, legitimate motives. First, Cowen's desire to perpetuate a system in which it earned significant profits is, in and of itself, perfectly rational and legal. Defendant had no obligation to buck existing practices that worked to its benefit in favor of partnering with a new, largely unknown company to implement a system that would result in smaller profits. Cowen, like all other broker-dealers, had good reason to refuse to deal with Inter-Vest, and it is perfectly plausible that each of the alleged conspirators made that decision individually. The broker-dealers did not need to conspire to reach the conclusion that doing business with InterVest was "unhealthy."

Second, Cowen advanced the observation that the opaque functioning of the bond market is entirely rational because it satisfies customer demand. Quite simply, the bond market remains closed because the individuals who buy and sell corporate and municipal bonds want it that way. Not a single customer has come forward as a participant in this litigation either to complain about the high spreads or to assert that the demise of InterVest denied them something they wanted. Though plaintiff has insisted on drawing comparisons between the bond and stock markets, the two differ sharply. Unlike the stock market, the bond market is not a "retail market." Rather than individual consumers, institutional investors buy and sell bonds and often engage in repeat transactions with the broker-dealers. The closed trading system permits these sophisticated customers to maintain anonymity and individually negotiate the spreads. The conduct of Cowen and the other broker-dealers in perpetuating this system is economically rational and is as consistent with permissible competition as with illegal conspiracy. Because plaintiff has presented only circumstantial evidence of illegal conspiracy and the conduct of defendant is ambiguous, plaintiff has not offered sufficient evidence of concerted action to survive Cowen's motion for summary judgment.

### D. *Ambook and the Third Circuit Trilogy*

Throughout this litigation, and in particular at oral argument, InterVest has adhered to the view that this case closely resembles the 1979 Second Circuit case of *Ambook Enter. v. Time Inc.*, 612 F.2d 604 (2d Cir.1979), and the Third Circuit trilogy of *Big Apple BMW*, *Alvord–Polk*, and *Rossi*. In each of those cases, the court determined that plaintiff had presented sufficient evidence to survive summary judgment on the issue of concerted action. After careful consideration, I find that plaintiff has misplaced its reliance on these cases as they differ markedly from the situation presented in the instant case. Because they may be useful to demonstrate the deficiencies in plaintiff's case, I will consider the distinctions.

In spite of its age, it was decided in 1979, and origin in the Second Circuit, InterVest contends that *Ambook* should control. In *Ambook*, the plaintiff challenged as a violation of § 1 of the Sherman

Act, a dual rate advertising system used by the publishing industry. If a firm purchased advertising space directly from a publication, it paid 15% more than when purchasing an identical ad through an advertising agency. In support of its claim of concerted action by the publishers, Ambook presented evidence that formerly the publishers and advertising agencies had entered into an agreement to perpetuate the dual price system, and that a 1956 consent decree with the government had terminated that arrangement. *See id.* at 611–12. It also offered proof of threats of retaliation for deviating from the scheme and identified the absence of an independent motive for adhering to the system. The media stood to profit by offering the same discount to direct advertisers, as it provided a unique opportunity to increase the publications share of the market for direct advertising. *See id.* at 614.

Though InterVest urges otherwise, the factual differences between the cases, and the presence of other, more damaging evidence in *Ambook,* leads me to conclude that I should decline to look to the Second Circuit's analysis for guidance. At the outset, I note that Judge Friendly wrote the *Ambook* opinion seven years prior to the Supreme Court's decision in *Matsushita.* Had *Matsushita*'s limitations on permissible inferences absent direct evidence existed at the time the Second Circuit ruled in *Ambook,* it is unclear that the court would have reached the same decision. Even assuming the same analysis would apply, other distinctions prove fatal to plaintiff's arguments. InterVest's reliance on this case rests primarily upon the notion that the opaque bond trading system that existed for many years resembles the one deemed suspect in *Ambook.* The Second Circuit considered as important evidence of concerted action, the long standing existence of the dual rate system, which originally arose from an illegal conspiracy, and had always offered uniform terms and conditions. *See id.* at 613–614. InterVest indicates that the fact finder could infer that the closed bond trading system arose from a similarly illicit arrangement. However, where Ambook offered unrefuted evidence of the dual price system's illegal origins, InterVest's argument relies on conjecture as it has not provided this court with any direct evidence of such an agreement. Further, InterVest has neither argued nor offered any proof to show a suspicious uniformity of spreads and consistent conditions of executing bond trades, like the congruity the Second Circuit found peculiar. The *Ambook* court also focused on the lack of a legitimate business justification for the publisher's conduct. Here, Cowen has come forward with an alternative and equally inferable explanation for the origins of the system. Ultimately, the distinctions between *Ambook* and this case are more marked than their similarities.

Over the past decade the Third Circuit has considered the meaning of circumstantial evidence in a post-*Matsushita* world in three major cases, *Big Apple BMW, Alvord–Polk,* and *Rossi.* In the first of these, *Big Apple BMW, Inc. v. BMW of N. Am.,* 974 F.2d 1358 (3d Cir.1992), plaintiffs, applicants for a BMW dealership, claimed that the distributor of cars acted in concert with BMW dealers to block plaintiffs' application because of plaintiffs' reputation as a high-volume, price-discounting dealership. Where the defendants offered legitimate reasons for their actions, plaintiffs countered these assertions with other evidence tending to indicate those reasons were pretextual and designed to hide their illicit conspiracy. *See id.* at 1360. Plaintiffs in *Big Apple BMW* relied exclusively on circumstantial evidence to establish the inference of concerted action. Plaintiffs presented evi-

dence that groups of BMW dealers met regularly to discuss advertising strategy and at one or more of these meetings the dealers expressed dissatisfaction with the possibility of plaintiffs obtaining a dealership. This group of dealers subsequently passed these feelings along to their distributor's regional manager, who eventually opposed awarding plaintiffs their dealership. The final denial of a dealership contrasted sharply with the earlier, eager pursuit by the defendant distributor of establishing a relationship with the plaintiffs. *See id.* at 1367–69.

InterVest has not come forward with any similar evidence of regular meetings among the broker-dealers, discussing either coordination of their efforts or any desire to destroy InterVest or any other transparent trading system, and has only shown individual meetings between it and various broker-dealers. In *Big Apple BMW*, plaintiff offered uncontroverted evidence of regular meetings, dialogue, and coordination among the defendants, something InterVest has not established in this case. Where BMW North America's reversal of position made their actions more suspect, Cowen steadfastly refused to deal with InterVest over a five year period. Though Bloomberg altered its relationship with plaintiff, unlike the *Big Apple BMW* plaintiffs, InterVest has not shown a steady stream of pressure running from a powerful group of dealers up to their distributor, and has only offered evidence of an isolated communication expressing dissatisfaction with InterVest. Even adhering to the Third Circuit's caution against "compartmentalizing" evidence, *id.* at 1364, the quantum of what InterVest has presented does not match the strong evidence presented by Big Apple BMW in order to survive the defendant's summary judgment motion.

In *Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996 (3d Cir.1994), dealers who sold wallpaper through toll free numbers filed an antitrust suit against manufacturers, retailers, and the retailers' trade association, alleging violations of § 1. While conventional retailers made significant investments in setting up showrooms, obtaining sample books, and hiring knowledgeable staff, plaintiffs were able to charge significantly less for the same product by selling to customers after they had utilized the services of the conventional retailers and having the manufacturer ship directly to the customer. *See id.* at 1001–02. Plaintiffs alleged that conventional retailers and manufacturers engaged in concerted action to eliminate them. In support of this contention, plaintiffs offered evidence that in 1986, the defendant trade association entered into a consent decree, just as the *Ambook* defendants had, with the government to cease and desist from anticompetitive actions, namely exerting pressure on manufacturers to refuse to deal with plaintiffs, but nonetheless, these actions continued. Specifically, the plaintiffs demonstrated that in trade magazines the retailer defendants publicly decried the plaintiffs' trade practices and referred to them as "pirates," at least one manufacturer defendant instituted a drop charge on deliveries that went directly to customers, and others created "local trading areas," which effectively barred 1–800 dealers from selling nationally. *Id.* at 1003–04. Though defendants offered some neutral explanations for their actions, they also indicated they were responding to pressure from the association of retailers and the fear that these retailers might stop purchasing sample books and other products from them. Though the court recognized the pro-competitive interests at stake in ridding the market of free riders, it ultimately held that plaintiffs had raised the inference that the manufacturer had

acted in concert with the retailer's trade association and should survive summary judgment. *See id.* at 1011–13.

Admittedly, the underlying scenario in *Alvord–Polk* and this case do resemble one another to the extent they seek to eliminate the middleman. However, InterVest ignores significant differences in its own evidence and the evidence presented to survive summary judgment in *Alvord–Polk*. As a trade association, any actions undertaken by that association inherently resulted from the coordination among individual firms. InterVest has offered no evidence linking the broker-dealer defendants together in a trade association or even shown that Cowen and its alleged co-conspirators even met. The defendants in *Alvord–Polk* and Cowen also held markedly different positions in the relevant market. As a trade association, the defendant in *Alvord–Polk* operated from a strong place in the market, making any pressure they exerted on the manufacturers more suspect. Here, InterVest has demonstrated that Cowen, a relatively small client of Bloomberg's, made a single complaint— evidence this court deems significantly less convincing that of an entire trade association making repeated complaints about their competitors over more than a decade. Therefore, like the decision in *Big Apple BMW*, the Third Circuit's opinion in *Alvord–Polk* does not instruct that I deny Cowen's motion for summary judgment.

The final case in the trilogy cited by plaintiff, *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir.1998), also supports the determination that InterVest has not provided sufficient evidence to survive summary judgment, rather than plaintiff's contention that it requires a denial of this motion. The plaintiff in *Rossi*, an aggressive price discounter, alleged that his competitors conspired with their main supplier to initiate a boycott against him. The court held that summary judgment was not appropriate as to Rossi's horizontal competitors and their primary supplier. As to its competitors, Rossi presented direct evidence of the conspiracy between them based on a threat he received that they "would do anything they could, stop supplies, cut the prices, whatever they had to do they were going to do to keep me out of business." *Id.* at 468. Plaintiff then supported this direct evidence with additional circumstantial evidence of meetings between the competitors, pressure they placed on other companies to refuse to deal with Rossi, and their extensive monitoring of Rossi's company. *See id.* at 469–71. By implicating the supplier in that conspiracy, plaintiff showed the conspiracy was economically plausible and provided circumstantial evidence of concerted action by showing a close connection between complaints and response, deviation from standard company policy, monitoring of Rossi, and pretextual excuses for their conduct. *See id.* at 475–78.

Unlike Rossi, InterVest has presented no direct evidence of nor has it claimed that Cowen made any direct threats against it. Even the circumstantial evidence Rossi used to bolster the direct evidence is stronger than the circumstantial evidence on which InterVest exclusively relies. Rather than pointing to a series of vaguely connected incidents as InterVest does, Rossi, in order to survive summary judgment, presented evidence of consistent and sustained actions by his competitors. Moreover, in *Rossi*, the plaintiff's competitors had significant economic leverage which increased the plausibility of concerted action. *See id.* at 744. Plaintiff has not shown that Cowen had any similar strength to move Bloomberg from making independent business decisions. Granting Cowen's summary judgment motion is entirely consistent with the *Rossi* decision and other Third Circuit precedent.

### E. *Antitrust Injury*

To prevail on a § 1 claim, in addition to showing concerted action, a plaintiff must also prove that the conspiracy proximately caused any injury it suffered. *See Rossi,* 156 F.3d at 465. Where plaintiff's business fails for a reason primarily unrelated to the antitrust violation, the Sherman Act does not permit recovery. *See id.* at 484–85. Cowen argues that for two reasons even if InterVest could show that Cowen participated in a conspiracy, that conspiracy did not cause any injury allegedly suffered by InterVest: (1) InterVest's trading system, InterVest 2.0, could not have handled the volume of trading necessary for InterVest to function as an efficient system; and (2) Bloomberg made an independent decision to terminate InterVest and without that delivery system, InterVest could not survive. Because I have already determined that InterVest has not demonstrated that defendant engaged in concerted action and therefore has not satisfied the first requirement of § 1, I need not decide this issue in granting Cowen's summary judgment motion on the § 1 claim.

### IV. *Tortious Interference With Contractual Relations*

#### A. *Applicable Law*

Under Pennsylvania law, in order to prove a claim for tortious interference with contractual relations, a plaintiff must demonstrate that: (1) a contractual or prospective contractual relationship existed between plaintiff and a third party; (2) defendant took purposeful action, intended to harm that relationship; (3) that no privilege or justification applies to the harmful action; and (4) damages resulted from the defendant's conduct. *See Remick v. Manfredy,* 238 F.3d 248, 263 (3d Cir. 2001).[20] A defendant's actions are privileged if the conduct: (1) concerns the subject of competition between the parties; (2) does not use wrongful means; (3) does not create an unlawful restraint on trade; and (4) has at least a partial goal of advancing an interest in competing with the plaintiff.[21] See *Gilbert v. Otterson,* 379 Pa.Super. 481, 550 A.2d 550, 554 (1988) (*quoting* Restatement (Second) of Torts § 768); *Pino v. Prudential Ins. Co. of Am.,* 689 F.Supp. 1358, 1362 (E.D.Pa.1988) (same). Though the same conduct may give rise to both an antitrust violation and a tortious interference claim, they remain distinct causes of action. *See Yeager's Fuel, Inc. v. Pa. Power & Light Co.,* 953 F.Supp. 617, 667 (E.D.Pa.1997) (noting that conduct insufficient to make out a claim under the Sherman Act may sustain a tortious interference action).

#### B. *Cowen Did Not Tortiously Interfere with the Contractual Relationship Between Bloomberg and InterVest*

InterVest has not presented sufficient evidence to survive Cowen's motion for

---

**20.** In interpreting a tortious interference claim, courts have looked to the Restatement of Torts for guidance. The Restatement instructs courts to consider the factual scenario in its entirety and consider the propriety of a defendant's actions and lists factors relevant in considering propriety. These inquiries include the type of conduct, the motive underlying that conduct, the interest with which that action interferes and the interests advanced by it, societal interests in either protecting or condemning the conduct, the nexus between the conduct and interference, and the nature of the relationship between the parties. *See Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 600 A.2d 545, 549 (1991) (*quoting* Restatement (Second) of Torts § 767).

**21.** The plaintiff has the burden of both pleading and proving that the defendant's conduct was not privileged. *See Remick,* 238 F.3d at 263 (discussing the pleading requirement); *DP–Tek, Inc. v. AT & T Global Info. Solutions Co.,* 100 F.3d 828, 836 (10th Cir.1996) (discussing burden of proof).

summary judgment on the tortious interference claim. In order to prevail on its claim, InterVest must show that: (1) it had a contractual relationship with Bloomberg; (2) that Cowen took deliberate actions with the goal of harming the InterVest and Bloomberg relationship; (3) Cowen's conduct was neither privileged nor justified; and (4) InterVest suffered damages because of Cowen's conduct.

InterVest has clearly established that a contractual relationship existed between itself and Bloomberg, satisfying the first element of a tortious interference claim. The second and fourth requirements, Cowen's deliberate actions and the alleged damages, present far closer questions, but need not be resolved in deciding this motion. Because InterVest has failed to present sufficient evidence to support a reasonable inference that Cowen took unprivileged actions, its tortious interference claim must fail.

▮ Cowen's conduct satisfies the four requirements for privilege. First, plaintiff and defendant competed for the same customers, purchasers of bonds, almost all of whom used the Bloomberg system. Therefore the availability of the InterVest trading platform on Bloomberg relates to the area of competition between the parties and satisfies the first element for privilege. With regard to the second requirement for privilege, Cowen did not use wrongful means. InterVest has only shown that Cowen made a single phone call to express concern about a competitor's product. Plaintiff has not presented any evidence of an explicit threat to stop using Bloomberg if InterVest remained on the system, nor have they rebutted defendant's assertion that it had insufficient economic power to compel Bloomberg to take action. Though naturally InterVest would have preferred that Cowen not express any negative reaction to its product to

Bloomberg, this does not mean that defendant used any improper or wrongful means by doing so.

I have already found that Cowen did not commit an antitrust violation, demonstrating the third requirement for privilege, that defendant did not create an unlawful restraint on trade. The phone call from Matthews to Garcia is insufficient to demonstrate concerted action between Cowen and Bloomberg. The subsequent freeze placed on the development of the municipal trading platform and the eventual termination of InterVest's contract with Bloomberg is consistent with an independent and rational business decision made by Bloomberg. Moreover, the connection between Cowen's complaint and the changes in Bloomberg and InterVest's relationship is tenuous at best. The immediate freeze on development concerned municipal bonds, an area of the market in which defendant had no involvement and Bloomberg did not terminate InterVest's contract until over thirteen months after the original complaint. Finally, Cowen's actions reflect the final element of privilege as they aimed to advance its interest in competing with InterVest. Because plaintiff and defendant offered similar products to customers, Cowen had an obvious goal of minimizing advertisements and publicity about the InterVest product. Because Cowen's conduct satisfies the requirements for privilege, InterVest cannot make out a tortious interference cause of action as a matter of law, and I will grant defendant's motion for summary judgment on this claim.

## V. *Conclusion*

InterVest has not sustained its burden on defendant's motion for summary judgment. While plaintiff presented significant circumstantial evidence, it offered no direct evidence of concerted action among

the defendant, other broker-dealers, and Bloomberg. Though the evidence presented could give rise to a reasonable inference that a conspiracy existed, it could just as easily give rise to the inference that Cowen acted independently and rationally in refusing to deal with InterVest. Defendant presented a coherent explanation for the structure of the market and plaintiff did not claim this explanation was pretextual. Defendant also admitted to preferring that system and the high spreads that went with it and confessed that it had little interest in making things easier for a company looking to change that system and compete with it for customers. So long as it did so independently, Cowen did not violate the law and I find that scenario is equally inferable from the evidence before me as the illicit one argued by InterVest is. Similarly, in complaining to Bloomberg, Cowen did not tortiously interfere with the contractual relationship between Bloomberg and InterVest. As a competitor of plaintiff's, defendant's conduct was privileged. Therefore, I will grant defendant's motion for summary judgment in its entirety.

### ORDER

**AND NOW,** this day of June 2002, it is **ORDERED** that defendant S.G. Cowen's motion for summary judgment is **GRANTED.** The clerk is directed to enter judgment in favor of defendant and against plaintiff and mark this action closed.